DETERMINED IN THE

## FOURTH DISTRICT

OF THE

# APPELLATE COURT OF ILLINOIS,

### DURING THE YEAR 1904.

## National Enameling and Stamping Company v. James Fagan, by his next friend.

1. IMPEACHING WITNESS—*what proper cross-examination of.* It is proper upon cross-examination of an impeaching witness to show for whom he acted in seeking information from the plaintiff as to how the injury occurred, in order that the fact and manner of his interest may appear.

2. IMPEACHING STATEMENT—*what evidence competent in rebuttal of.* Where a written statement offered by way of impeachment has been introduced, it is competent, where it was claimed that such statement was false and was obtained by fraud and deception, to show all that was said and done at the time it was so obtained.

3. ASSUMED RISKS—*what come within doctrine of.* It is those risks alone which cannot be obviated by the master's exercise of reasonable care, prudence and diligence that the servant assumes.

Action on the case for personal injuries. Appeal from the Circuit Court of Madison County; the Hon. BENJAMIN R. BURROUGHS, Judge, presiding. Heard in this court at the August term, 1903. Affirmed. Opinion filed March 10, 1904. Rehearing denied August 25, 1904.

WISE & McNULTY and McKEIGHAN & WATTS, for appellant.

WEBB & WEBB and BURTON & WHEELER, for appellee.

MR. PRESIDING JUSTICE CREIGHTON delivered the opinion of the court.

This was an action in case, in the Circuit Court of Madison County, by appellee, a boy fifteen and a half years old, against appellant, to recover for personal injuries sustained by appellee while in the service of appellant. Trial by jury. Verdict and judgment in favor of appellee, for $1,950.

Appellant was engaged in the manufacture of graniteware. A portion of its work was carried on in a large building with a cupola on top. In this cupola were forty-two windows, for light and ventilation. During the summer months these windows would be opened during the day time, and at or just before quitting time each day, would be closed. There was no appliance or means of any kind provided for closing them, except that of climbing to the top of the building and closing each window by hand. These windows were not accessible from the inside of the building and there was no inside way of ascent or descent. The only way of reaching them was by means of two ladders on the outside of the building, extending to the top, a distance of fifty or sixty feet from the ground. These ladders were constructed of two-by-four inch scantling, for uprights, with rungs sunk into the uprights and nailed thereto. They stood perpendicular to the wall, about ten inches from it, and each was fastened to the wall by four supports or braces; two at the window sills, about half way up, and two at the top of the wall. One of the ladders was attached to the wall of the building on the north side and one on the south side, about opposite each other, and there were two doors leading into the yard, one on the north side and one on the south side of the building. Both the ladders had originally extended to the ground, but about a year before the injury here complained of and about eight months before the injured boy commenced to work for appellant, an ice wagon had backed against the one on the south side and broke about six feet off the bottom end of it, and appellant allowed it to remain in that condition.

Appellee was a boy about fifteen and a half years old

and he and about twenty other boys and men were engaged in one department of appellant's business, carried on in the building above mentioned, under a boss by the name of William Corrigan, who employed and directed the men and boys in that department. It was part of Corrigan's duty to have the windows of the cupola closed, and his custom was, at or a few minutes before quitting time for the day, to order some of the boys in his department to go and close them. These windows were called skylights.

About five minutes before quitting time, on July 31, 1902, the foreman ordered the skylights closed. It was then commencing to rain. Appellee and three other boys responded to this order. They all ascended by the ladder on the north side of the building; it was nearest to them. When they reached the top of the building, appellee and one of the boys went over to the south side and closed the twenty-one windows or skylights on that side. The boys who closed the windows on the north side descended by the ladder on that side, and appellee and his companion, who closed the south side, started to descend by the ladder on that side. When appellee was about half way down and his companion was just getting onto the top of the ladder the supports or braces pulled loose, the ladder fell out from the building, carrying the boys with it to the ground. Appellee was badly injured. His ankle joint was dislocated, badly sprained and ruptured. " The bone was dislocated and broken off." The injury is permanent.

The only grounds urged by appellant's counsel in support of their contention that the judgment in this case should be reversed are, the admission of certain evidence on behalf of appellee and their view as to the weight of the evidence.

During the trial appellant produced, for the purpose of impeachment, one Fred L. Vandeveer, an attorney from St. Louis, who produced and identified what he said were statements in writing made by appellee and one of his witnesses soon after the injury occurred. Vandeveer had testified in chief that he was an attorney at law, connected

with McKeighan & Watts of St. Louis; that he had gone to appellee's house and had a conversation with him in regard to how the injury happened; that he took down what appellee said, read it over to him and that appellee signed it. He testified substantially the same as to the statement of appellee's witness. On cross-examination, Vandeveer was asked whom the firm of McKeighan & Watts, for whom he was acting, represented. To which, over appellant's objection, he answered, "The Travelers' Insurance Company. * * * I went to Venice to get this statement at the request of McKeighan & Watts. I supposed it would be sent to the Travelers'." During further cross-examination of this witness, as to what occurred and what was said while he was at the house of appellee's parents when appellee's statement was taken, he denied, among other things, that he had told appellee and his mother that he came to get information about the injury, so that the insurance company could settle the claim. To this no objection was interposed. In rebuttal, by way of denying the statements of the witness Vandeveer, and in giving appellee's version of what was said and done on the occasion of signing the alleged statement, appellee and his mother, over appellant's objection, stated, among other things, that Vandeveer said he wanted to do something for appellee with the insurance company.

Counsel contend that it was error in the trial court to allow Vandeveer to state that in taking the statement of appellee he was acting for a firm of attorneys who represented an insurance company. It does not appear from the record just what relation the insurance company sustained to the case, but it does clearly appear that it was interested in the result of the suit, and that its interest was adverse to appellee and that it was on the side of appellant. Appellant had put an interested witness on the stand to prove a material fact, and it was perfectly proper that on cross-examination such witness should be required to disclose the fact that he was interested and in what manner. Chicago City Ry. Co. v. Carrol, 206 Ill. 318–327.

Counsel further contended with reference to the evidence, that it was error to allow appellee and his mother to testify in rebuttal to what Vandeveer said about the insurance company doing something for appellee. This was after Vandeveer had identified the statement and given his version of how it was obtained and what was said and done in connection therewith and the statement had been admitted in evidence, and appellee was contending that the statement was false and that his signature was obtained to it by deception and fraud. At this stage of the trial it was proper for appellee to give evidence in denial of Vandeveer's statements, and to give his version of all that was said and done in connection with the obtaining of his signature to the statement. Considering this evidence in the light of the manner in which it came into the case, there was no error in admitting it.

In support of their contention as to the admissibility of the evidence above discussed, appellant's counsel cite Cox v. City of Chicago, 83 Ill. App. 540. This case has not the slightest application to a state of facts such as we have before us in this record. There, Cox had sued the city of Chicago for a personal injury resulting from a defective sidewalk. At the time Cox was injured he was carrying an ordinary accident policy, and at the time his case against the city was tried the accident company had paid him $150 on account of his injuries, in compliance with the terms of its contract. The trial court allowed the city to prove the payment of this insurance, in bar of Cox's right to recover from the city, and instructed the jury that on account of having received this money from the insurance company Cox could not recover from the city. The Appellate Court held that the admission of such evidence and the giving of such instruction were error; that the fact that Cox collected the money due him from the insurance company could not avail the city as a defense when sued for its tort.

Counsel for appellant admit that the ladder was dangerous; that it had been so for a year before appellee was in-

jured; that appellant knew that it was dangerous; that it neither repaired it nor removed it, but allowed it to remain in place. They admit negligence on the part of appellant to the full extent charged. But they contend as to the facts in dispute, first, that appellee was not ordered to go on top and help close the skylights, on the occasion of his injury, and second, that he knew of the dangerous condition of the ladder before he attempted to come down on it, or that by the exercise of reasonable diligence he would have known. And they contend as to the law, that appellee is barred from any right to recover, by proper application of the law of assumed risk; and further, that he is guilty of contributory negligence, and is therefore barred.

The governing law in this, as in all other cases, must arise out of the controlling facts. It is, therefore, necessary that we determine from the evidence what facts the jury was warranted in finding. Upon the question of fact as to whether appellee was ordered to go up and help close the skylights on the occasion of his injury, it is an undisputed fact that Mr. Corrigan, the foreman, gave an order to go up and close the skylights; that the four boys who for some time past had usually performed that service, responded to the order with the knowledge of the foreman and without remonstrance or protest from him; that appellee was one of these four boys; that the order on this occasion was given at the usual time of day for the giving of this order, and that there were forty-two windows to close, a rain was coming up and it was only five minutes to quitting time. Three of these boys testified that they were all ordered to go, one testified that he was ordered to go and did not hear any order given to the others, and this witness said, " usually we all went up and closed the windows together." Mr. Corrigan, the foreman, testified that he only ordered one of them to go. No other witness testified upon that subject, and we are of opinion the jury was abundantly warranted in resolving that issue in favor of appellee.

As to appellee's knowledge of the dangerous condition of the ladder, the evidence shows that a piece had been broken

off the bottom of it about eight months before appellee commenced to work for appellant; that it was allowed to remain in place as though it were perfectly safe to be used for the purposes for which it was placed there; that an iron pot and boxes were placed at the foot, where the piece had been broken off; no notice or warning was posted, nor was any information on the subject given to appellee or published among the employees of the department after appellee went there to work, and it was in actual use for its intended purpose, by appellee and others, prior to the injury. Appellee testified that he did not know that the ladder was dangerous, and that no one ever told him it was dangerous or not to use it. Two others of the boys who helped to close the skylights on the occasion of appellee's injury, and who for about three months prior to that time had usually assisted in closing them, testified to the same effect as appellee, and that they used this ladder often. Appellee further testified that he went up on the north ladder because it was nearest to the place from which they started, and when he went over on top, and closed the windows on the south side, he came down on the south-side ladder because it was nearest.

Appellant produced a number of witnesses who testified that they knew the ladder was dangerous. Most of these were mature men who knew that the ladder as originally constructed extended to the ground, and all but three of them were there at the time the lower end was broken off and knew all about the fact, and one of the others had been there four or five months longer than appellee. This falls far short of so conclusively overthrowing appellee's evidence on this point as to warrant the court in setting aside the finding of the jury upon the whole evidence. And further, none of these witnesses, nor any one else, ever informed appellee of the danger or directed his attention to it, and the very fact that he got on to the ladder fifty or sixty feet from the ground, tends to prove that he did not at the time know it was dangerous.

Appellant's counsel insist that the value of appellee's

evidence is destroyed.by certain impeaching evidence bear-ing upon the testimony of appellee and one of his witnesses. One witness testified that he had a conversation with appellee about five minutes after he was hurt, and that appellee said he knew the ladder was "impaired;" that the words appellee used were, " the ladder was out of order." Appellee denies making this statement, but if he did make it, it does not follow that he meant thereby to state that he knew before the occasion of the injury that it was danger-ous for him to use the ladder. In this same connection, the attorney Vandeveer, whose interests were wholly against appellee and all with appellant, was introduced and testi-fied that a few days after the injury he called at the home of appellee's parents, talked with appellee about the injury and how it occurred, and after he got through the conversation, sat down and wrote a statement and carefully read it over to appellee and he signed it. This state-ment was admitted in evidence. The witness testified to substantially the same state of facts as to a statement signed by one of appellee's witnesses, which was also ad-mitted in evidence. The statement signed by appellee con-tains the following: "The ladder which broke with us was an old rotten one; it had been pieced once or twice at least. It had been in this condition ever since I worked for the company. I noticed its condition when I first started to use the ladder, about a week prior to the accident. My brother used to work for the company and he told my father the rotten condition of the ladder and my father told me never to use this ladder." Appellee and his mother and his sister, who were present all the time during Vande-veer's visit, testified in rebuttal, in substance, that appellee did not state to Vandeveer the matter above quoted from the statement, nor certain other matter contained in it; that Vandeveer did not read to appellee the matter quoted nor certain of the other matter now appearing in the statement; that when Vandeveer pretended to read the statement to appellee he was sitting on one side of the room and appellee on the other; that appellee did not read

it and could not see what was in it while it was being
read; and that Vandeveer said he wanted a statement of
how it happened and the extent of the injury so the insur-
ance company could settle the claim.   The other witness
whose statement was taken and admitted in evidence testi-
fied that Vandeveer did not read to him certain things that
appear in the statement, that he did not read it himself,
and that he did not tell those things to Vandeveer.   The
insurance mentioned was not accident insurance in favor
of appellee, but indemnity insurance presumably in favor
of appellant.

In addition to the fact that Vandeveer was an interested
witness, and was contradicted by four witnesses, the state-
ment as he produced it in court, bears evidence on its face
of having been prepared for a purpose, by some one who
was more familiar with the law of assumed risk and con-
tributory negligence, than with the undisputed facts of
this particular case.   The statement says the ladder was
"an old rotten one."   Now no one claims that it was in
fact either old or rotten.   The statement says it "had been
pieced once or twice at least."   It had in fact never been
pieced at all.   The statement says that appellee first started
to use the ladder "about a week prior to the accident."
The undisputed evidence as to the fact is, that he first
started to use it about three months " before the accident."
The statement says appellee's " brother used to work for the
company."   The undisputed fact is, that appellee's brother
is his twin and worked for the company (appellant) at the
same time appellee did; was one of the boys sent up to close
the skylights on the occasion of the injury, continued to
work there after the injury and was working there at the
time Vandeveer took the alleged statement.   The statement
says appellee's brother told his father, " the rotten condi-
tion of the ladder and his father told appellee never to use
this ladder."   The undisputed evidence as to the fact is, that
appellee's brother did not himself know the ladder was
dangerous, did not speak to his father about it, the father
had no knowledge on the subject and did not tell appellee

never to use it. All the father ever said on the subject was said two days after appellee was injured, when the brother came home from his work and informed the father that the foreman had ordered him to go up again. The father told him not to go up there any more. It was for the jury to determine as to the weight of the evidence and who was impeached.

As to assumed risks the general rule is that the law does not require the servant to assume the risk of being injured by the master's negligence. The law does not recognize the master's negligence as being a risk incident to the servant's employment. It is those risks alone which cannot be obviated by the master's exercise of reasonable care, precaution and diligence that the servant assumes. Western Stone Co. v. Muscial, 196 Ill. 382; C. & G. T. R. R. Co. v. Spurney, 197 Ill. 471; C. & A. Ry. Co. v. Howell, 109 Ill. App. 546; C. & A. Ry. Co. v. Brady (opinion filed at present term).

Appellant's counsel contend that this case falls within a recognized exception to the general rule. They contend that here the danger was open and obvious and that appellee either did know or must be held to have known that it was dangerous to use the ladder, and must be held to have voluntarily assumed the risk. This involves primarily a question of fact, as to whether the danger was so obvious as that appellee ought under all the circumstances of the case to have known it. In this connection it must be borne in mind that the servant has the lawful right, in the first instance, to rely upon the master to perform his duty and furnish reasonably safe appliances, and has the right to assume that the master has done so, and he may act upon this assumption without himself being chargeable with negligence. The ordinary servant is not required to assume that the master has neglected his duty, and to go on a tour of inspection all over the plant and premises in search of defects, man-traps, pitfalls or other unusual dangerous conditions. He has the right to assume that none such exist.

By way of recapitulation we may state that the evidence clearly shows, or tends strongly to prove, that appellee was a boy; that his experience had not been great; that he did not commence to work for appellant until eight months after the lower end of the ladder was broken off; that he had never seen it as it was originally constructed; that it was fastened to the building by four supports or braces; that there was a pot and a box at the bottom, where the piece had been broken off; that if appellee had ever observed that the ladder did not reach the ground, there is no evidence that he knew it had not been originally constructed that way; that he had no notice or warning that it was dangerous; that he found it there in position, held out as safe and inviting use for the purpose for which it was constructed, and in actual use for that purpose. Under such circumstances no court could say that the jury ought to have found that appellee either knew or should have known that the ladder was dangerous, nor could any court say that the jury ought to have found appellee guilty of contributory negligence.

The judgment of the Circuit Court is affirmed.

*Affirmed.*